IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JILL HODGE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PERMANENT GENERAL ASSURANCE CORPORATION, a Tennessee corporation,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Jill Hodge ("Plaintiff"), by and through undersigned counsel, brings this class action, individually and on behalf of all others similarly situated, against Defendant Permanent General Assurance Corporation ("Permanent General" or "Defendant") and alleges as follows:

**INTRODUCTION**

1. This class action lawsuit arises from Defendant's unconscionable and unfair scheme through which Defendant systematically undervalues total-loss vehicles in order to arbitrarily reduce the ultimate payment to insureds who make total loss claims under insurance policies issued by Defendant.

2. In the event of a "total loss" to an insured vehicle—*i.e.*, where repair of the vehicle is impossible or uneconomical—Defendant's uniform insurance policies with Plaintiff and all putative Class members ("Class," defined below) promise to pay for the loss, limited to the actual cash value ("ACV") of the vehicle. Attached as **Exhibit A** is a copy of Plaintiff's insurance policy

1

("Policy"), which is materially identical to the policies that provides coverage to all members of the Class.

3. Defendant's standardized policy language as to coverage for the ACV of total-loss vehicles is present in every auto policy issued by Defendant.

4. Pursuant to the basic tenets of insurance law, once Defendant elects to pay ACV, they are bound by that election and cannot thereafter change its mind and decide to later pay the cost to repair or replace the amount of loss. *See* 12A Couch on Ins. § 176.23. Put differently, when Defendant declares a vehicle a total loss and chooses to invoke its ACV limitation on liability, they are obligated under its insurance Policy to pay the ACV of the vehicle to the insured.

5. Defendant ignores and avoids its straightforward contractual obligation to pay ACV by directing its third-party vendor, Audatex or AudaExplore, to systematically reduce total loss valuations by applying a so-called "typical negotiation adjustment" to comparable vehicles that purportedly reflects some sort of average difference between a dealer list price and selling price. The "typical negotiation adjustment" is a significant downward adjustment to the base values of comparable vehicles used to determine the ACV of total loss vehicles, which ranges from 4-11% of the value of the "comparable vehicle." Vehicles with lesser value are subject to a greater percentage reduction, with the percentage adjustment becoming lower as the value of the "comparable vehicles" increases. This percentage reduction artificially reduces the total-loss payment for the totaled vehicle and, with the sliding percentage scale, ensures that every total-loss payment Defendant makes to insureds is significantly, but unconscionably, reduced. By artificially reducing ACV through the "typical negotiation adjustment," Defendant pays less than a vehicle's ACV and breach its contractual obligation to pay ACV after total-loss incidents.

6. The "typical negotiation adjustment" is not based on actual negotiations, typical or otherwise, it is contrary to appraisal standards, and is not based on any market realities. Worse,

Defendant and its vendors possess data that *affirmatively shows* there is no material difference between online listed prices and sold prices. So Defendant simply "cooks the books" with respect to the data they rely on to purportedly support the application of a "typical negotiation adjustment" to create a manufactured data set. It does this by, among other things, excluding from the data all instances where a car is sold at a price equal to or greater than the list price.

7. It is unsurprising that the very data on which the "typical negotiation" adjustment is purportedly based actually shows there is no difference between listed prices and sale prices, and thus in fact no "typical negotiation." This is because the concept of a "typical negotiation adjustment" does not reflect current market realities—it is based on an antiquated and false (if perhaps meretricious) premise. The used auto market is such that, given the ubiquity of Internet advertising and shopping, as well as developments in sophisticated pricing software, car dealerships simply do not negotiate off of Internet advertised prices. But Defendant simply ignores its own data, ignores these inconvenient market realities, and pay insureds and claimants below-market value prices for their totaled vehicles.

8. Notably, Audatex's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions—does not apply typical negotiation adjustments. Instead, CCC Intelligent Solutions uses list prices.

9. Plaintiff takes no issue with Defendant's general use of Audatex's Autosource Market-Driven Valuation ("Autosource") database as containing an adequate number of comparable vehicles to determine ACV. This lawsuit challenges only Defendant's application of an unsupported "typical negotiation adjustment" to those comparable vehicles to artificially reduce the amount of its ACV payment to insureds. Indeed, the evidence suggests that the option to apply a "typical negotiation adjustment" can be toggled off as Audatex does not apply this adjustment in some states on behalf of certain insurance companies.

3

10. An integral part of Defendant's fraudulent scheme is a provision of Policy which requires the parties to submit to an appraisal if there is a disagreement over the loss. As designed, the appraisal clause prevents Plaintiff and the Class from effectively vindicating their statutory and common law causes of action. In any event, this case asks the singular question of whether Defendant can apply an arbitrary and made-up calculation—based on manipulated data and faulty assumptions—to artificially reduce the value of insured vehicles and associated insurance payouts. That question cannot be resolved through the appraisal process.

11. Through Defendant's deceptive scheme of devaluing total-loss vehicles, Defendant breached its contracts and the covenant of good faith and fair dealing with its insureds.

12. As a result of Defendant's breaches, Plaintiff did not receive the benefit of her bargain, and thus sustained actual damages.

13. By this action, Plaintiff, individually and on behalf of the Class, seeks damages and injunctive and declaratory relief.

**PARTIES**

14. Plaintiff Jill Hodge, at all relevant times, was a Mississippi citizen. Plaintiff owned a 2017 Chevrolet Tahoe that was insured under a Policy issued by Defendant, which was deemed a total loss on or around October 23, 2018. Plaintiff made a claim with Defendant for the total loss of the vehicle. Defendant provided a total loss valuation to Plaintiff for the total loss claim. Defendant based its offer upon a valuation report obtained from Audatex. Defendant valued Plaintiff's total loss claim at $12,077.00. The market valuation report listed values of five different comparable vehicles and shows that Defendant and its vendor applied a "typical negotiation adjustment" of approximately 6% to all comparable vehicles without itemizing or explaining the basis of each adjustment and/or how the value of the deduction was determined. *See* Plaintiff's Market Value Report at 3-4, attached as **Exhibit B**.

15. Defendant Permanent General Assurance Corporation is a Tennessee company with its principal place of business in Tennessee. Permanent General provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensive coverage. Permanent General is a subsidiary of Permanent General Companies, Inc.

**JURISDICTION AND VENUE**

16. This Court has personal jurisdiction over Defendant because Defendant resides in this district. Defendant directs, markets, and provides its business activities throughout the State of Tennessee and makes its insurance services available to residents of Tennessee.

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because at least one member of the putative class, including Plaintiff, are citizens of Mississippi, and Defendant is a citizen of Tennessee, thus CAFA's minimal diversity requirement is met. Additionally, Plaintiff seeks an award of damages (including actual, compensatory, statutory, and punitive, as provided by law) and restitution to Plaintiff and the Class in an amount to be determined at trial, for each violation, which, when aggregated among a proposed class of potential thousands, exclusive of interests and costs, exceeds the $5,000,000 threshold for federal jurisdiction under the Class Action Fairness Act ("CAFA").

18. Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) because Defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

**FACTUAL ALLEGATIONS**

A. **"Typical Negotiation"**

19. When valuing total-loss automobile claims, insurance companies like Defendant use third-party companies with databases of vast numbers of comparable vehicles. Defendant utilizes those third-party databases to determine and pay what it purports to be the ACV of an

insured's totaled vehicle subject to the policy deductible (if applicable) and the salvage vehicle value (if the insured retains the totaled vehicle).

20. To avoid full payment under its policies, Defendant has devised a blatant and unlawful scheme to reduce its total-loss payments to insureds by use of a deceptive, arbitrary, and baseless "typical negotiation adjustment."

21. Specifically, Defendant purports to determine the ACV of total-loss vehicles via a third-party vendor, Audatex or AudaExplore, through a system called Autosource. The Autosource system identifies the price of comparable vehicles listed for sale online in the relevant geographic market. Plaintiff does not contest the selection of the comparable vehicles to be used, nor does Plaintiff claim that Defendant inaccurately notes the listed prices of those vehicles.

22. To these listed prices, Defendant applies adjustments to the respective comparable vehicles' price if there are differences between vehicle trim. For example, if the totaled vehicle has a higher trim level than the comparable vehicle, Defendant increases the listed price of the comparable vehicle (under the sound theory that if the comparable vehicle had a higher trim, it would have been listed at a higher price). And of course the opposite is also true—if the comparable vehicle has a higher trim level, Defendant decreases the listed price. Plaintiff does not challenge the vehicle equipment adjustment, nor the amounts of those adjustments.

23. But Defendant, through its vendor, also applies an invalid and arbitrary "typical negotiation adjustment" to the listed prices of the comparable vehicles.

24. Defendant's "typical negotiation adjustment" is arbitrary and unsupportable. When offering the total-loss payment to an insured whose car was totaled, Defendant represents that the "typical negotiation adjustment" reflects some sort of average difference between a dealer list price and selling price. *See* Ex. B at 3 ("The selling price *may* be substantially less than the asking price.

6

In the case of this 2007 Chevrolet Tahoe, the difference between the asking price and the selling price is generally 6%.").

25. But the "typical negotiation adjustment" is not based on any negotiations, typical or otherwise, is contrary to appraisal standards, and is not based on any market realities. Worse yet, Defendant ***knows this to be the case***: Defendant and its vendor possess data demonstrating there is virtually no difference between average listed price and average sales price.

26. This data shows that the difference is less than 1%. Yet Defendant represents that the difference is 4% (for the highest price band) to 11% (for the lowest price band). Defendant arrives at this invented differences by simply excluding the millions of transactions where vehicles were sold for an amount equaling or exceeding its listed price. Much like a company who conducts a survey and discovers that mushrooms are a topping on 100% of pizzas by excluding all pizzas on which mushrooms are not a topping, Defendant excluded all transactions with no negotiation and then represented that all transactions include a negotiation off the cash price.

27. Of course, even this minimal average difference between listed prices and sold prices does not reflect a negotiation—and certainly not a negotiation off of the cash price—and does not justify a minimal "typical negotiation" adjustment. Instead, it reflects the limited transactions where generally unavailable discounts are applied: employee discounts, for example, or friends/family discounts, or military discounts.

28. It also reflects reductions based on shifting profits where the consumer agrees to finance through the dealership and, thus, the dealership agrees to shave a bit off the listed price because it is more than making up the profit in interest. But this is irrelevant, given that Defendant's obligation is to pay actual ***cash*** value, not actual finance-agreement value.

29. Moreover, the across-the-board 4-11% reduction on used vehicles' internet prices does not reflect market realities, and neither relevant state insurance laws and regulations nor the

7

Policy permit Defendant to make this arbitrary deduction. Indeed, Defendant applies the "typical negotiation adjustment" without contacting the identified dealerships or sellers, or considering whether the online retailer ever discounts their vehicles. Indeed, particularly during the COVID-19 pandemic, and the related supply chain problems with parts such as electronics for vehicles, used cars have been selling for a premium, with sale price typically *increasing* from posted price if it changes at all.[1]

30. Rather, the arbitrary "typical negotiation adjustment," ranging from 4-11% of the value of the comparable vehicle is keyed only to the value of that vehicle, as the value of the "comparable vehicles" increases. This sliding percentage scale does not reflect "actual value" of the vehicle vehicles or any "typical negotiation," but rather is meant to ensure that Defendant's total loss payments are significantly reduced, even when a vehicle is not valuable.

31. In other words, to anyone with knowledge of the used auto market, that empirical transactional data shows virtually no difference between listed online prices and sold prices is not at all surprising. This is because the notion that car dealerships price vehicles to allow room for individual negotiation is antiquated and does not reflect market realities—nor has it for at least 15-20 years. Given the ubiquity of internet advertising and shopping, and the development of sophisticated pricing tools, car dealerships now price vehicles to market and do not negotiate down from the listed price.

32. This is particularly true of the price listed on the internet. Because of the ease with which consumers can simultaneously compare the internet price of materially identical vehicles from numerous dealerships, dealerships must price those vehicles to market, meaning the lowest

---

[1] *See* https://www.cnbc.com/2021/08/07/used-car-prices-to-stay-high-until-automakers-fix-production-issues.html (last visited Sept. 16, 2021); https://abc7chicago.com/car-chip-shortage-2021-prices-auto-gm-closes-factories/11005980/ (last visited Sept. 16, 2021).

8

amount they will accept for the vehicle. It is simply not the case that dealerships list a price on the internet that is 4-11% higher than the vehicle's market value and then negotiate down from there.

33. Once the adjusted average price of the comparable vehicles is determined—i.e., after application of the "typical negotiation" adjustment—Defendant then imposes further adjustments based on differences between the average comparable vehicle and the totaled vehicle based on mileage, condition, and options. Just as Plaintiff does not contest the vehicles Defendant selected to use as comparable vehicles, nor Defendant's representations of the listed price of comparable vehicles, nor the "vehicle equipment" adjustment, Plaintiff also does not contest the adjustments based on mileage, condition, and options. What Plaintiff contests is that Defendant instructed Audatex to apply arbitrary, capricious, and invalid "typical negotiation" adjustment across-the-board in determining its total-loss payments.

34. Damages are the difference between a properly calculated ACV—i.e., without application of the invalid, arbitrary, and capricious typical negotiation adjustment—and what Defendant (mis)calculated ACV to be. In Plaintiff's case, that amount is $803.00.

35. The average online listed price of comparable vehicles, prior to application of the typical negotiation adjustment, was $13,380.00. Exh. B at pg. 3. But Defendant then represented there is an average "negotiation" of 6%, and applied that typical negotiation percentage, which amounts to $803.00. As such, Defendant represented that the base market value was $12,577.00, rather than $13,380.00. *Id.* at pg. 1.

**B. Defendant's Deceptive and Unfair Appraisal Process**

36. As an initial matter, Plaintiff does not dispute the amount of loss, which is physical damage to the vehicle, and, as such, this claim is not subject to appraisal.

37. When a vehicle sustains loss, meaning physical damage, insurers, like Defendant, calculate the amount it would cost to repair the damage to the vehicle, which often includes

9

Case 3:22-cv-00608   Document 1   Filed 08/11/22   Page 9 of 19 PageID #: 9

replacement of component parts, thereby restoring the vehicle to its condition from prior to the loss to the vehicle. Most accidents result in "partial" losses, meaning the vehicle is repairable.

38. Defendant's liability to pay the loss amount—i.e., the amount necessary to repair or replace the damage to the vehicle—is not limitless, however. When the amount necessary to repair the loss exceeds ACV, Defendant is not liable for the full loss amount; instead, it is only liable for the amount of that loss to which its liability is limited, i.e., ACV.

39. For example, assume a $10,000.00 is in a serious accident, and it will cost $12,000.00 to repair the damage. Defendant is not liable for the full $12,000.00--instead, it's liability is limited to ACV, i.e., $10,000.00.

40. Here, the possibility for appraisal is triggered by "disputes over the amount of loss." Here, there is no such dispute. Plaintiff does not contest that the amount of loss exceeded ACV, and, thus, that ACV is the relevant payment obligation. And the appraisal clause does not say that appraisal is triggered by "disputes over the amount of ACV."

41. Having said that, even if the claim were theoretically appraisable, it would be inappropriate to submit it to appraisal. The appraisal clause is an integral part of Defendant's deceptive and unfair scheme. The appraisal provision requires the insured and the insurer to hire, at their own expense, an appraiser and to bear equally the expenses of the appraisal. Since the amount by which the insureds' total-loss claims are underpaid is likely less than the cost of the appraisal, Defendant knows that the insureds will forego the appraisal process and accept the artificially reduced ACV of the vehicle for their total-loss claims. As designed, the appraisal clause prevents Plaintiff and the Class from effectively vindicating their statutory and common law causes of action.

42. Plaintiff's claim, for example, alleges $488.00 in damages. The average appraiser charges approximately $500.00, not including any costs, and which does not even include splitting

the costs of the umpire. As such, compelling appraisal of total-loss claims renders it cost-prohibitive to seek to vindicate an insured's contractual rights to payment of the properly-calculated ACV.

43. To be clear, this case does not present a dispute about the loss. Rather, this case challenges Defendant's fraudulent scheme to illegally undervalue insureds' vehicles that are declared a total loss, in order to increase its own profits. This is an issue that cannot be resolved through an informal appraisal process—which does not allow for discovery, witness testimony, analysis of the empirical data, or cross-examination—that is part of that very scheme.

44. Moreover, the Policy is an unconscionable contract of that was unilaterally drafted by Defendant with full knowledge of the unfair scheme they intended to employ to artificially reduce the value of their insured's vehicles, and neither Plaintiff nor the members of the Class had any roll in drafting its terms.

45. All conditions precedent to the initiation of this suit have been satisfied.

## CLASS ACTION ALLEGATIONS

46. Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

> All Mississippi citizens insured by Defendant who, from the earliest allowable time through the date of resolution of this action, received a first-party total loss valuation and payment on an automobile total loss claim that included a "typical negotiation" adjustment.

47. Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members.

11

Case 3:22-cv-00608   Document 1   Filed 08/11/22   Page 11 of 19 PageID #: 11

48. Plaintiff reserves her right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded or narrowed, divided into additional subclasses under Rule 23(c)(4), or modified in any other way

49. **Numerosity.** The members of the Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are thousands of Class members, the precise number is unknown to Plaintiff but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

50. **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

   a. whether Defendant's practice of applying a "typical negotiation adjustment" in determining total-loss payments results is a breach of its obligation to pay ACV;

   b.

   c. whether Defendant's practice of applying a "typical negotiation adjustment" in determining total-loss payments breached the covenant of good faith and fair dealing it has with Plaintiff and the other Class members;

   d. whether Defendant's manipulation of the data and failure to control for all relevant factors in calculating the "typical negotiation adjustment" breached the covenant of good faith and fair dealing;

   e. whether Plaintiff and the Class are entitled to declaratory relief based on Defendant's conduct; and

   f. whether Plaintiff and the Class are entitled to damages and the measure of damages

owed to them.

51. **Typicality.** Plaintiff's claims are typical of the other Class members' claims because Defendant undertook the same practice of applying a "typical negotiation adjustment" in determining total-loss payments under materially similar policy provisions requiring payment of ACV. Plaintiff's claims are based upon the same legal theories as those of the other Class members. Plaintiff and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

52. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members whom she seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

53. **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be impracticable for the Class members to individually seek redress for Defendant's wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action

device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

54. **Rule 23(b)(2)**: All or some of Plaintiff's claims are also certifiable under Fed. R. Civ. P. 23(b)(2), because Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT 1
## BREACH OF CONTRACT

55. Plaintiff repeats and re-alleges all previously alleged paragraphs as if fully alleged herein.

56. This Count is brought on behalf of the Class.

57. Plaintiff and each of the other Class members were insured under a policy issued by Defendant, as described herein.

58. Plaintiff and each of the other Class members made claims under their insurance contracts, which Defendant determined to be covered first-party total losses under the insurance contract, and invoked the Policy's ACV limit on liability rather than paying to repair the vehicles.

59. Pursuant to the above-described contractual provisions, upon the total loss of their insured vehicles, Defendant purported to pay Plaintiff and each of the other Class members the ACV of their totaled vehicles.

60. Defendant, however, failed to pay the ACV of Plaintiff's and Class members' vehicles because Defendant applied an arbitrary and capricious "typical negotiation" adjustment to comparable vehicles in order to pay less than the vehicles' market value and, as such, to reduce Defendant's total-loss payments to insureds.

61. Thus, Defendant failed to pay Plaintiff and each of the other Class members the promised ACV of their total-loss vehicles and thereby breached its contract with Plaintiff and each of the other Class members.

62. Plaintiff and Class members were damaged in the amount of the difference between Defendant's calculated of the adjusted market value of their respective vehicles, and what the calculated amount would have been had Defendant not imposed the "typical negotiation" adjustments.

63. Alternatively, if a de minimus "typical negotiation" adjustment amount is permitted, any such amount must be calculated based on all relevant data transactions, and without excluding all data transactions where sold prices matched or exceeded list prices. Under this alternative damages theory, damages are the amount of the adjusted market value as calculated by Defendant's and what it would have been had the "typical negotiation" adjustment been calculated based on consideration of all relevant data.

64. As a result of such contractual breaches, Plaintiff and each of the other Class members have been damaged and are entitled to recover damages, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT 2
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

65. Plaintiff repeats and re-alleges all previously alleged paragraphs, except those allegations made under the preceding Count, as if fully alleged herein.

66. This Count is brought on behalf of the Class.

67. Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each

other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

68. Disputes involving the exercise of good faith arise when, inter alia, one party is given broad discretion in performing its obligations under the contract. Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

69. To the extent Defendant had discretion to perform its obligations under the contract, including the obligation to determine the ACV of an insured's total-loss vehicle, Defendant exercised its discretion unreasonably, with improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties.

70. As such, Defendant breached the covenant of good faith and fair dealing by, *inter alia*:

   a. Intentionally applying "typical negotiation" adjustments to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

   b. Excluding overwhelming amounts of relevant empirical data where sold prices matched or exceeded list prices;

   c. Assuming that any difference between sold price and list price in its millions of transactional data is attributable solely to negotiation of the cash price of a vehicle for sale;

   d. Failing to conduct any investigation or research whatsoever into whether given car dealers will negotiate from a vehicle's online listed price;

e. Interpreting the terms and conditions of its insurance policies in an unreasonable manner solely in an effort to understate the value of total-loss vehicles and avoid paying insureds the ACV on their total-loss claims;

   f. Inventing spurious grounds for undervaluing total-loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

71. Defendant's breaches of the covenant of good faith and fair dealing have caused damages to Plaintiff and the Class. Plaintiff's and the Class members' damages include the amounts improperly deducted by Defendant from its payments to insureds on the basis of a typical negotiation adjustment.

## COUNT 3
## DECLARATORY JUDGMENT

72. Plaintiff repeats and re-alleges all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

73. This Count is brought on behalf of the Class.

74. A dispute between Plaintiff and the Class and Defendant is before this Court concerning the construction of the auto insurance policies issued by Defendant, and the rights of Plaintiff and the Class arising under that policy.

75. Plaintiff, individually and on behalf of the Class, seeks a declaration of rights and liabilities of the parties herein. Specifically, Plaintiff believes that and seeks a declaration that in paying total loss claims by first-party insureds, Defendant cannot reduce the market value of totaled vehicles through "typical negotiation" adjustments that are (a) arbitrary, (b) contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value), and (c) not reasonably specific or appropriate as to dollar amount.

76. Alternatively, Plaintiff seeks a declaration that Defendant must consider all relevant data transactions—and not exclude data merely because it conflicts with its thesis—in calculating the typical negotiation amount.

77. Defendant disagrees, because it believes that it is permitted under its Policy and Mississippi law to impose a typical negotiation adjustment in calculating the ACV of totaled vehicles. As such, there is a bona fide disagreement between the Parties.

78. Defendant's unlawful common policy and general business practice as described herein are ongoing. Accordingly, Defendant has breached, and continues to breach, the express terms of its contracts of insurance with Plaintiff and members of the Class.

79. As a result, Plaintiff and the Class members have been injured.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully seek judgement in Plaintiff's favor and in favor of the Class as follows:

A. An Order certifying this action as a Class Action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B. An award of damages to Plaintiff and the Class according to proof and in accordance with law;

C. Appropriate preliminary and/or final injunctive, declaratory, and/or equitable relief against the conduct of Defendant's described herein;

D. An award Plaintiff's and the Class' costs of suit, including reasonable attorneys' fees as provided by law; and

E. An award of such further and additional relief as is necessary to redress the harm

caused by Defendant's unlawful conduct and as the Court may deem just and proper under the circumstances.

Dated: August 11, 2022

Respectfully submitted,

**BRANSTETTER, STRANCH & JENNINGS, PLLC**

*/s/ J. Gerard Stranch, IV, BPR 23045*
J. Gerard Stranch, IV
223 Rosa L. Parks Ave., Ste. 200
Nashville, TN 37203
(615) 254-8801
gerards@bsjfirm.com

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Esq.
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq.*
Florida Bar No. 0100537
Chris Gold, Esq.*
Florida Bar No. 088733
scott@edelsberglaw.com
chris@edelsberglaw.com
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Office: (786) 289-9471
Direct: (305) 975-3320
Fax: (786) 623-0915

*\* pro hac vice forthcoming*

**Counsel for Plaintiff and the Proposed Class**